781 A.2d 952

Nasirrudin Abdullah BEY,

v.

STATE of Maryland.

No. 1046, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 26, 2001.

608

**610**

George E. Burns, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Jack Johnson, State's Attorney for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before DAVIS, KENNEY, and CHARLES E. MOYLAN, Jr. (Ret., specially assigned), JJ.

DAVIS, Judge.

Appellant Nasirrudin Abdullah Bey was convicted by a jury sitting in the Circuit Court for Prince George's County (Johnson, G.R.Hovey, J.) of second degree murder and use of a handgun in the commission of a felony or a crime of violence.[1] The court sentenced him to consecutive terms of imprisonment of thirty and twenty years, respectively. Appellant asks the following three questions on appeal:

 I. Did the suppression court err in not suppressing his confession because he was not expeditiously brought before a commissioner after his arrest?

 II. Did the trial court err in excluding lay opinion testimony by a police officer that appellant was possibly under the influence of PCP [Phencyclidine] at the time of his arrest?

---

1. The jury acquitted appellant of first degree murder.

III. Did the trial court err in refusing to instruct the jury that voluntary intoxication is a defense to second degree murder?

We shall affirm the judgments of the trial court.

To place in context the questions raised, we shall provide a brief recitation of the facts as elicited at appellant's trial. In addition, in reciting the suppression hearing facts, we shall emphasize the time of events as that is an important factor in the suppression issue he raises.

During the early morning hours of April 2, 1999, appellant and several friends were "hanging out" in an abandoned house near the Martin Luther King Recreation Center on Church and Piedmont Streets in Glenarden, Maryland. After the group separated, appellant walked alone toward the recreation center when he encountered Kareem Nafu Brooks, the victim. The two had been friends but appellant had recently become angry with the victim, believing that he had betrayed him in some manner. Appellant shot the victim six times and stabbed him twelve times with a knife, causing his death. After killing the victim, appellant encountered two of his friends—John Robinson and David Outlaw—that he had been with earlier. Appellant then left the area.

Approximately two weeks later, on April 14, 1999, Robinson and Outlaw gave separate statements to the police. In their statements, they related that appellant had admitted to having killed the victim.[2] The next day, pursuant to an arrest warrant, the police arrested appellant. While at the police station, appellant confessed to killing the victim.

Appellant testified that, during the night of April 1 and the early morning hours of April 2, 1999, he was using PCP with his friends. He remembered being with them at an abandoned house but did not remember anything after that until he awakened the next morning at his girlfriend's house. Ap-

---

**2.** At trial, Robinson recanted his statement testifying that the police coerced him into giving the statement.

pellant also testified that he was under the influence of PCP at the time of his arrest.

## SUPPRESSION HEARING FACTS

At approximately 3:55 p.m. on April 15, 1999, the police arrested appellant near an apartment complex in Glenarden, Maryland, pursuant to an arrest warrant. Appellant asked Detective Kevin Curtis, the arresting officer, on what grounds they were arresting him. Detective Curtis told him that, if he had any questions, he should talk to the officer in charge of his case. Although Detective Curtis had a copy of the arrest warrant and the charging document, he did not give appellant a copy of either.

Corporal Michael Straughan, the lead investigator in the homicide investigation, met appellant at the Landover Police Station at 4:10 p.m. Corporal Straughan searched appellant and removed, among other things, several bullets from appellant's coat pocket. Those bullets, upon later testing, matched the bullets recovered from the victim's body. Detective Straughan then placed appellant in an interview room, handcuffed him by the wrist to the wall, and placed ankle cuffs on him.

Corporal Straughan left the room but returned several minutes later and asked appellant some personal information. At approximately 4:55 p.m., Corporal Straughan advised appellant of his rights from an Advice of Rights and Waiver form. Corporal Straughan read the form, which advised appellant that he had, *inter alia*, the right to remain silent, the right to talk to a lawyer, the right to have a lawyer present while being questioned, the right to have a lawyer appointed to represent him if he could not afford one, and the right to stop answering questions at anytime.

During this time, appellant also told the corporal, upon being asked, that he was not under the influence of drugs or alcohol at the time, that he had not been threatened or promised anything by the police, and that he was a 1996 graduate from a local high school. According to Corporal Straughan, appellant did not appear intoxicated in any way—

he had no difficulty communicating, he was alert, and he spoke clearly. Appellant had no difficulty walking, understanding directions, and he had no complaints regarding his physical well being. Corporal Straughan found appellant cooperative and appellant appeared "normal, coherent, very calm."

Appellant then placed his initials next to each advisement and signed the form. After signing the form, the corporal asked appellant if he had any questions and appellant replied that he did not. Appellant then indicated that he wanted to make a statement.

After getting appellant a cup of coffee, Corporal Straughan told appellant that he wanted to talk to him about the victim. Corporal Straughan told appellant that he knew that he had gotten into a fight with the victim and killed him and he asked appellant to tell him what had happened. Appellant then

indicated to me that Kareem had crossed him, that he felt Kareem was out to get him, that he felt it necessary to get Kareem before he got him. He had indicated that he thought Kareem was his brother but Kareem was not, that Kareem was evil and that he thought he did what he had to do.

Corporal Straughan spoke with appellant for approximately one hour.

At approximately 8:00 p.m., appellant wrote an eight-page statement, which included a question and answer portion written by Corporal Straughan. The statement was completed at 9:31 p.m. Corporal Straughan asked appellant to read it over, to make any corrections that he wanted, to initial each page of the statement, and to initial each answer he gave in the question and answer section.

After completing the statement, Corporal Straughan asked appellant to take him to the locations where he hid the weapons used to kill the victim. Appellant agreed. After giving him something to eat and letting him use the restroom, they set out in a police van with another officer driving.

Appellant directed the officers to several locations approximately a ten minute drive from the police station. He first directed them to a tree in a residential area near the crime scene. At that location, the police found a .38 handgun. Appellant then directed them to the Martin Luther King Recreation Center, which was two blocks away. He pointed to a soda can in the gutter and said the knife was near the soda can. The police recovered a knife. Appellant then directed them to a nearby trash can where he said he had burned his clothes. The police looked in the trash can and saw evidence of a recent fire. They then returned to the police station at approximately 11:00 p.m.

Upon their return, appellant was again placed in an interview room. Detective Nelson entered the interview room and spoke with appellant for approximately five minutes. At approximately 1:00 a.m., Corporal Straughan questioned appellant about the murder of a mini-mart owner in the same area as the victim's murder. Their conversation ended at 2:08 p.m. At 2:10 a.m., appellant consented to giving a saliva sample, which was then taken. Corporal Straughan returned to the interview room at approximately 2:25 a.m. and again spoke to appellant. From 3:11 a.m. until 4:00 a.m., appellant gave a six-page written statement confessing to killing the owner of the mini-mart.

After memorializing the second statement, appellant was released for processing. He was taken before a commissioner at 1:37 p.m. on April 18, 1999. This was approximately twenty-one hours after appellant first arrived at the police station. Corporal Straughan testified that the reason he did not take appellant before a commissioner upon his arrest was because he wanted to interview him. While Corporal Straughan was with appellant, appellant was "alert, awake, at times emotional," meaning "at times crying, at times he was remorseful, at times he was very descriptive, very articulate, very adamant in recalling details of the incident, and basically very informative in reference to what had happened in both cases." No one other than appellant and Corporal Straughan

were present in the room when he interviewed appellant about the murders of the victim and the mini-mart owner.

## DISCUSSION

### I

Appellant argues that the trial court erred in not suppressing his confession.[3] He asserts that his confession was involuntary because the police did not take him before a commissioner "without unreasonable delay" after his arrest and because the police did not inform him of the charges against him when they arrested him or when they interviewed him. We perceive no error in the trial court's ruling denying the motion to suppress.

Maryland Rule 4–212(e), regarding the execution of warrants, provides, in pertinent part:

Unless the defendant is in custody, a warrant shall be executed by the arrest of the defendant. *Unless the warrant and the charging document are served at the time of the arrest, the officer shall inform the defendant of the nature of the offense charged and of the fact that a warrant has been issued.* A copy of the warrant and charging document shall be served on the defendant promptly after the arrest. The defendant shall be taken before a judicial officer of the District Court *without unnecessary delay and in no event later than 24 hours after arrest*[.]

(Emphasis added.)

On July 1, 1981, the Maryland General Assembly enacted Md.Code (1998 Repl.Vol., 2000 Supp.), Cts. & Jud. (C.J.) § 10–912, which provides:

Failure to take defendant before judicial officer after arrest.

---

**3.** We note that appellant's question relates only to his confession of the victim's murder. Therefore, we shall not address the voluntariness of appellant's confession regarding the mini-mart owner.

(a) *Confession not rendered inadmissible.*—*A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.*

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest *is only one factor, among others,* to be considered by the court in deciding the voluntariness and admissibility of a confession.

(Emphasis added.) Thus, the delay in bringing a defendant before a judicial officer after an arrest is "only one factor, among others," in deciding the "voluntariness and admissibility of a confession."

■■■■ Voluntariness of a confession is determined under both Maryland non-constitutional law, i.e., Maryland common law, and the Due process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights.[4] *Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622 (1988). Under Maryland non-constitutional law, a confession is voluntary if it is free from "coercive barnacles." *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415 (1979). Whether a confession is free from "coercive barnacles" depends on the totality of the circumstances surrounding the defendant's confession, including

> where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given *Miranda* warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court

---

**4.** Voluntariness of a confession is also measured by conformance with the mandates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant does not argue that the police failed to comply with the requirements of *Miranda* and, therefore, we shall not address that aspect of voluntariness.

commissioner following arrest, and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Hof v. State,* 337 Md. 581, 596–97, 655 A.2d 370 (1995) (citations omitted). *See also Young v. State,* 68 Md.App. 121, 510 A.2d 599 (1986)(the Court found that because the police had interrogated the defendant "almost continuously" for twenty-two and one-half hours by means of a relay team, the conduct of the police coupled with the duration of custody and interrogation rendered the defendant's confession involuntary).

In determining whether a confession is voluntary under the United States Constitution and the Maryland Declaration of Rights, we look to the decision of the Supreme Court in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly,* the Supreme Court held that "coercive police activity" is a necessary element to finding a confession involuntary. *Id.* at 167, 107 S.Ct. 515. The Court stated that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. 515 (footnote omitted). The Court reasoned that a contrary rule would require "sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State." *Id.* at 167, 107 S.Ct. 515.

■ Applying the above law to the facts of the instant case, we perceive no error in the trial court's holding that appellant's confession regarding the victim was voluntary. The record discloses no untoward coercion by the police. At the time of his arrest, appellant was twenty-one years old and had a high school education. Appellant was given *Miranda* warnings before the questioning and he signed and placed his initials next to each advisement. Appellant was questioned in an interview room for approximately one hour, during which he confessed to shooting and stabbing the victim. Only one police officer, Corporal Straughan, questioned appellant. In

addition, no other officer was present with Corporal Straughan during the questioning. Corporal Straughan testified that he did not threaten appellant in any way, nor did he offer him any promises.

Although appellant testified at trial that he was under the influence of PCP at the time of his arrest, at the time he gave the statement, he told Corporal Straughan that he was not under the influence of any drugs. In addition, Corporal Straughan testified that appellant physically and mentally seemed normal. *See Hopkins v. State,* 19 Md.App. 414, 423, 311 A.2d 483 (1973)("A confession is not inadmissible as evidence merely because the accused is under the influence of a narcotic drug, although the condition of the accused is a factor to be considered [in determining whether his confession is admissible]."). Because we are considering the first confession, the fact that appellant was not taken before a commissioner until approximately twenty-one hours after being brought to the police station and that he was not informed of the charges against him are not distinct factors to be taken into account in assessing the voluntariness of the confession under consideration. There was no evidence that appellant's will was overborne by police tactics or that the police engaged in a method of interrogation to cause him to submit from exhaustion.[5] He was not physically or psychologically mistreated in any way and was given a meal and a bathroom break.[6] Under the circumstances presented, we hold that his confession was voluntary.

Appellant cites *Young v. State,* 68 Md.App. 121, 134, 510 A.2d 599 (1986), in support of his argument that his confession was involuntary. In that case we wrote, "while allowing for necessary delays in presenting a defendant before a judicial officer, [Rule 4–212] does not countenance a delay *for the*

---

5. Were we to address the confession with respect to the mini-mart owner, we might view the evidence differently.

6. The record does not reflect whether appellant requested or was allowed to sleep at any time during the period prior to giving his confession.

*principal purpose of obtaining a statement or a confession from the defendant."* *Young,* 68 Md.App. at 134, 510 A.2d 599 (emphasis added)(*quoting Meyer v. State,* 43 Md.App. 427, 434, 406 A.2d 427 (1979)). That statement was a restatement of the federal *McNabb–Mallory* Rule, so named after the cases that bear those names. *See McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

In *McNabb, supra,* the issue presented was the voluntariness of the confessions given by three brothers who were accused of shooting and killing a federal officer. The three brothers were in their early to mid twenties, had lived their entire lives in a small area called the McNabb Settlement, approximately twelve miles from Chattanooga, none had gone beyond the fourth grade, and none had ever traveled farther from their home than Jasper, a town twenty-one miles away. *McNabb,* 318 U.S. at 334, 337, 63 S.Ct. 608. Two of the brothers were brought to the police station and questioned over a two-day period. The other brother was strip searched prior to questioning. No less than six officers questioned the brothers at the same time. *Id.*

The applicable law in effect at the time provided that a person arrested by the Federal Bureau of Investigation "shall be immediately taken before a committing officer." *Id.* at 342, 63 S.Ct. 608 (citing 18 U.S.C. § 595, 5 U.S.C. § 300a, and 18 U.S.C. § 593). The Court stated that requiring the police to "immediately" bring an arrested person before a judicial officer

constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the "third degree" which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental

but a sturdy view of law enforcement, it outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection.

*McNabb,* 318 U.S. at 344, 63 S.Ct. 608 (footnote omitted). The Court further stated:

The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. Freeman and Raymond McNabb were arrested in the middle of the night at their home. Instead of being brought before a United States commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their detention, they were put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers [mostly six officers at the same time]. Benjamin's confession was secured by detaining him unlawfully and questioning him continuously for five or six hours. The McNabbs had to submit to all this without the aid of friends or the benefit of counsel.

*McNabb,* 318 U.S. at 344–45, 63 S.Ct. 608. The Court then held that the brothers' confessions must be suppressed.

In *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), a nineteen-year-old of limited intelligence was taken to a police station for questioning regarding the rape of a co-tenant the day before. He was questioned between thirty and forty-five minutes by at least four officers and in the presence of other officers. He then agreed to submit to a lie detector test. About five hours later, the police administered the lie-detector test. Appellant was questioned for nearly one and one-half hours of steady interrogation during which he eventually confessed to the rape. He dictated his confession to a typist several hours later. He was taken before a commissioner the morning after his arrest.

The issue before the Supreme Court was the admissibility of his confession. The relevant law was Rule 5 of the Federal Rules of Criminal Procedure, which was promulgated in 1946.

Rule 5(a) provides that an officer shall take an "arrested person without unnecessary delay before the nearest available commissioner[.]" The *Mallory* Court reviewed the requirements of Rule 5(a), writing:

> The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he [or she] may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be "booked" by the police. But he [or she] is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his [or her] guilt.

> The duty enjoined upon arresting officers to arraign "without unnecessary delay" indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. *But the delay must not be of a nature to give opportunity for the extraction of a confession.*

> The circumstances of this case preclude a holding that arraignment was "without unnecessary delay." Petitioner was arrested in the early afternoon and was detained at headquarters within the vicinity of numerous committing magistrates. Even though the police had ample evidence from other sources than the petitioner for regarding the petitioner as the chief suspect, they first questioned him for approximately a half hour. When this inquiry of a nineteen-year-old lad of limited intelligence produced no confession, the police asked him to submit to a "lie-detector" test. He was not told of his rights to counsel or to a preliminary examination before a magistrate, nor was he warned that he might keep silent and "that any statement made by him may be used against him." After four hours of further detention at headquarters, during which arraignment could easily have been made in the same building in which the police headquarters were housed, petitioner was examined by the same building operator for another hour and a half

before his story began to waiver. Not until he had confessed, when any judicial caution had lost its purpose, did the police arraign him.

*Mallory,* 354 U.S. at 454–55, 77 S.Ct. 1356 (emphasis added). The Court then suppressed the confession.

Maryland adopted the per se exclusionary rule of *McNabb–Mallory* in *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), a 4–3 decision. The *Johnson* Court explained that "the protection of the right of an accused to prompt production before a judicial officer following arrest will be most effectively accomplished by a *per se* exclusionary rule." *Johnson,* 282 Md. at 328, 384 A.2d 709. The Court reasoned that the exclusionary rule was necessary to preserve the integrity of the criminal justice system.

The *Johnson* exclusionary rule, however, was abrogated when the Maryland General Assembly, on July 1, 1981, enacted C.J. § 10–912. Since then we have scrutinized the admissibility of confessions under a totality of circumstances standard. *See Marr v. State,* 134 Md.App. 152, 165, 759 A.2d 327 (2000)("the delay in bringing the defendant before a judicial officer after an arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.")(quotations and citations omitted). *See also* Romualdo P. Eclavea, Annotation, *Admissibility of Confession or Other Statement Made by Defendant as Affected by Delay in Arraignment—Modern State Cases,* 28 A.L.R.4th 1121 (1984, 2000 Supp.). Thus, the fact that the police did not immediately bring appellant before a commissioner because they first wanted to question him, does not automatically lead to exclusion. Rather, we look to the totality of circumstances to determine if the confession was voluntarily given. Under the circumstances of the case *sub judice* as discussed above, we hold that it was.

## II

Appellant argues that the trial court erred in not permitting him to cross-examine a police officer regarding his condition at the time of his arrest.

Detective Kevin Curtis, a sixteen-year veteran of the police department and an arresting officer, testified on cross-examination that he had encountered many people who were under the influence of PCP; that people under the influence of PCP behaved erratically, from calm to very violent and combative; and that while transporting appellant to the police station, appellant volunteered that he "was a child of PCP." The court sustained the State's objection to two questions asked by defense counsel—whether appellant's behavior was not inconsistent with someone who was under the influence of PCP and whether appellant could have been under the influence of PCP at the time that Detective Curtis arrested him. Appellant contends that the trial court's rulings were wrong. We disagree.

Maryland Rule 5–701, titled "Opinion Testimony by Lay Witnesses" provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

In addition, a lay witness is not qualified to express an opinion about matters "which are either within the scope of common knowledge and experience of the jury or which are peculiarly within the specialized knowledge of experts." *Rosenberg v. State*, 129 Md.App. 221, 254, 741 A.2d 533 (1999) (*quoting King v. State*, 36 Md.App. 124, 135, 373 A.2d 292 (1977)). Whether to admit lay opinion testimony is vested in the sound discretion of the trial judge. *Rosenberg*, 129 Md.App. at 254–55, 741 A.2d 533.

Lay opinion testimony generally falls into one of two categories. The first category is lay opinion testimony "where it is impossible, difficult, or inefficient to verbalize or communicate the underlying data observed by the witness." *Robinson v. State*, 348 Md. 104, 119, 702 A.2d 741 (1997). The second category is lay opinion testimony when the "the lay trier of

fact lacks the knowledge or skill to draw the proper inferences from the underlying data." *Id.* at 120, 702 A.2d 741 (citing Edward J. Imwinkelried, *Evidentiary Foundations* 241 (3rd ed.1995)). In *Robinson,* the Court gave an example of this type of opinion-a former naval construction worker relating the relative degree of safety connected with different methods of operating a crane. *Robinson,* 348 Md. at 120, 702 A.2d 741 (citing *Scott v. John H. Hampshire, Inc.,* 246 Md. 171, 176–77, 227 A.2d 751 (1967)). As to the latter category, Maryland recognizes that law enforcement officials often have specialized training and experience to justify permitting them to offer testimony in the form of a lay opinion. *See Robinson,* 348 Md. at 120, 702 A.2d 741 and citations therein.

In *Robinson,* the Court of Appeals held that testimony of State troopers that a substance in a baggie was crack cocaine was inadmissible lay opinion testimony. In analyzing the issue presented, the Court reasoned that the troopers did not have sufficient personal knowledge to give such an opinion. Specifically, the Court held that, although the record indicated that the troopers had training and experience enabling them to perceive the visual characteristics of suspected cocaine, there was no showing that they had the necessary training and experience to identify accurately the chemical nature of that substance.

The *Robinson* Court also found that the troopers' testimony was not helpful to the trier of fact. The Court, citing several cases, repeated that a lay opinion must be based "on probability and not on mere possibility." The Court stated that "a speculative opinion will not be helpful to the trier of fact." *Robinson,* 348 Md. at 128, 702 A.2d 741. Applying the facts to the law, the Court held:

> The troopers made an assumption, based on their relative experience, that the substance seized was crack cocaine. This assumption, "although possessing a certain common sense appeal," was too conjectural to establish the chemical composition of the alleged contraband with substantial certainty. *See Calhoun [v. Honda Motor Co., Ltd.],* 738 F.2d 126, 131–33 (6th Cir.1984) (rejecting testimony when the

witness's "assumption . . . is not supported by the type of evidence necessary to reach th[e] conclusion"). Accordingly, the troopers' lay opinion testimony in this case was not helpful to the jury, and should not have been admitted. *Robinson,* 348 Md. at 128, 702 A.2d 741.

■ Applying the above law to the facts of the instant case, we hold that the trial court did not abuse its discretion in excluding Detective Curtis's lay opinion testimony. Detective Curtis testified that, as a fifteen-year police veteran, he had had contact with many people under the influence of PCP. He also testified that a person under the influence of PCP could exhibit a wide range of behavior and emotion. Detective Curtis was in contact with appellant for a short time and, other than appellant telling Detective Curtis that he was a child of PCP, Detective Cutis noted nothing unusual about appellant's physical or mental well being. Given the wide range of behavior a person under the influence of PCP may exhibit, and the limited information available to Detective Curtis about appellant at the time of appellant's arrest, we believe that Detective Curtis was not qualified to express his opinion regarding whether appellant may have been under the influence of PCP at the time of his arrest. In addition, any opinion expressed would not have been helpful to the jury. The questions posed as to whether appellant's behavior was "not inconsistent" with someone who was under the influence of PCP and whether appellant "could have been" under the influence of PCP, were too conjectural to aid the jury.

Under the facts presented and the applicable law, we perceive no abuse of discretion by the trial court in excluding Detective Curtis's lay opinion regarding whether appellant may have been under the influence of PCP at the time he was arrested.

### III

In his third contention, appellant raises an issue that 1) is academically fascinating but 2) has no dispositive applicability to this appeal. The issue, in its broadest sense, is the avail-

ability of the defense of voluntary intoxication to a charge of second degree murder and the necessary content of any jury instruction with respect to such a defense.

Inherent in the issue of what an instruction should contain are two categories of information. The first is a simple and conclusory statement of what the law is. That is something that a jury must know in order to return a fair verdict and on which jury instructions are, therefore, clearly appropriate. The second is the sometimes doctrinally subtle and academically nuanced analysis of why a law is what it is and how it came to be. That may be the subject matter for a graduate course dealing with, e.g., the arcana of criminal homicide. It may not, on the other hand, be necessary subject matter for lay jurors.

Legal rules themselves are promulgated on an *ad hoc* basis by decisions in actual cases. They constitute what the law is. The academic explanations for these rules, by contrast, may be worked out far more slowly and, in both text books and in the case law, sometimes follow only decades later. Although jurors, of course, need to know *what* the law is, the ensuing and esoteric explanations of *why* it is are not necessarily grist for their mill.

■ Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant the requested instruction if the matter is fairly covered by instructions actually given.

Under this rule, a trial judge is required to give a requested instruction which correctly states the applicable law if it has not been fairly covered in the instructions already given. *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984); *Lansdowne v. State,* 287 Md. 232, 239, 412 A.2d 88 (1980); *Scott v. State,* 64 Md.App. 311, 322, 494 A.2d 992 (1985).

Before we move on to the question of whether the instruc-
tion actually given in this case fairly covered everything the
jury needed to know, there is the threshold question of what
precise instruction, if any, appellant requested and the related
question of whether the requested instruction accurately stat-
ed the law. Appellant's counsel submitted, in writing, a list of
twenty-four "Proposed Jury Instructions." Each proposed
instruction was nothing more than a one-line reference to a
particular Maryland Pattern Jury Instruction—Criminal
(MPJI–Cr). For present purposes, the critical request was
No. 23, which simply referenced:

> MPJI–Cr No. 4:17.1 Homicide—First Degree Premeditated
> Murder and Second Degree Specific Intent Murder (Volun-
> tary Intoxication but no Justification or Mitigation Generat-
> ed).

As thus requested in writing, the trial judge gave Pattern
Jury Instruction (PJI) 4:17.1 essentially verbatim. After
unexceptionable definitions of first degree and second degree
murder, he turned to the defense of voluntary intoxication:

> The defense has raised the affirmative defense that the
> defendant in this case was intoxicated by alcohol and drugs
> at the time that the killing took place. Keep in mind now,
> although the defense advanced this affirmative defense, the
> State has got to prove to you, not the defense, the State has
> to prove to you the opposite, that the defendant was not so
> intoxicated that he was unable to form the requisite intent
> with respect to first degree murder. I will read to you this
> instruction. It is very, very crucial. Listen carefully.

The trial judge's explanation of the voluntary intoxication
defense then followed the PJI word for word.

> You have heard evidence that the [appellant] acted while
> intoxicated by drugs and alcohol. *Voluntary intoxication*
> *may be a defense to first degree murder. However, it is not*
> *a defense to second degree murder* because that charge does
> not require premeditation and deliberation. If the [appel-
> lant] was so intoxicated at the time of the homicide that he
> was unable to have acted deliberately or with premeditation,

then he cannot be guilty of first degree murder, although *he could be guilty of second degree murder.*

A person can be drinking and taking drugs, and can even be intoxicated, but still have the necessary mental faculties to act deliberately and with premeditation. In order to convict the [appellant] of first degree murder, the State must prove to you beyond a reasonable doubt that the degree of intoxication did not prevent the [appellant] from *acting deliberately and with premeditation.*

(Emphasis added.)

With respect to any *written* request for instructions, therefore, there was no error in this case. Any possibility of error would have to arise out of an oral request that the PJI should have been somehow modified or supplemented.

■ Before the instructions were given to the jury, there was apparently an in-chambers conference at which the instructions were discussed. Also, apparently, appellant's counsel had at least a glimmer of an idea and wanted the judge to modify or to expand upon the effect of voluntary intoxication on second degree murder. Nothing was in writing, however; nor was any transcript made of the in-chambers conference. We do not know, therefore, how accurately counsel put forward the budding idea or how fully he developed it. The burden, of course, is on appellant's counsel to state clearly what the problem is and to state clearly what precise instruction is being requested. A mere passing allusion to a difficult conceptual area will not suffice. The dialogue upon the return to the courtroom was, at best, ambiguous.

> THE COURT: Is there anything we need to do before I instruct the jury?
>
> [APPELLANT'S COUNSEL]: Just do you prefer that I put on the record at this point my objection to the first degree, second degree specific intent, voluntary intoxication?
>
> . . .
>
> THE COURT: All right.

[APPELLANT'S COUNSEL]: Briefly, what we talked about was the fact that voluntary intoxication being a defense to first degree specific intent but not going to a defense to specific intent second degree murder.

THE COURT: That's the law in this State.

[APPELLANT'S COUNSEL]: I understand that, Your Honor, and I would just take exception to the instruction and to the verdict sheet to that extent.

THE COURT: All right. I'll give you a continuing objection to the instruction ... I mean 4–17.1 because that's the one that that instruction relates to.

[APPELLANT'S COUNSEL]: Very good.

THE COURT: That says clearly that voluntary intoxication may be a defense to first degree murder; however, it is not a defense to second degree murder ... because that charge does not require premeditation and deliberation.

[APPELLANT'S COUNSEL]: Very well, Your Honor.

It is clear to us from the exchange that appellant's counsel and the trial judge were not reading from the same page. They were talking across each other, in the apparent belief that their positions were contradictory and not realizing that the partial statement of each could readily be reconciled with the partial statement of the other.

What appellant's counsel seemed to be trying to say was that voluntary intoxication can erode any specific intent, including the specific intent to kill and can, therefore, preclude a conviction for second degree murder of the specific-intent-to-kill variety. That statement is correct—as far as it goes. It does not say, however, that a defendant could not be convicted of second degree murder of some other variety. The judge, for his part, was insisting that voluntary intoxication will not preclude a conviction for second degree murder generally. That statement is also correct—as far as it goes. It does not say, however, that a defendant could be convicted of second degree murder of the specific-intent-to-kill variety.

▉ The issue between the judge and appellant's counsel was never cleanly joined. Who is at fault for such a failure of communication? Appellant, we hold, ran afoul of Maryland Rule 4–325(e), which states, in pertinent part:

> No party may assign as error ... the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, *stating distinctly the matter to which the party objects* and the grounds of the objection.

(Emphasis added.)

Appellant failed to *state distinctly* what he wanted the jury to be instructed about. Indeed, our reading of appellant's brief leads us to conclude that he has not fully and accurately mastered the subject even as of this appeal. He seems to be dancing around a subject without fully comprehending it. Under the circumstances, it was inevitable that he failed to state distinctly what he wanted by way of a supplementation of MPJI–Cr 4:17.1. At trial, he took exception to MPJI–Cr 4:17.1 to the extent that it explained:

> If the defendant was so intoxicated at the time of the homicide that he [or she] was unable to have acted deliberately or with premeditation, then he [or she] cannot be guilty of first degree murder, *although he [or she] could be guilty of second degree murder.*

(Emphasis added.)

In terms of the bottom-line question of what the law is, that instruction is absolutely correct. In terms, moreover, of Rule 4–355(c)'s requirement that "the matter [be] fairly covered by instructions actually given," that instruction told the jury everything the jury needed to know.

As far as the arcane academic question of how such a rule came to be is concerned, the Comments to the PJI go beyond the jury instructions themselves and provide a more detailed analysis for the bench and bar. The Notes on Use to MPJI–Cr 4:17.1 point out that the instruction should be used "in conjunction with MPJI Cr 5:08 (Voluntary Intoxication)" and there is a further "Cross Reference" to MPJI–Cr 5:08.

MPJI–Cr 5:08, in turn, deals with the applicability of the voluntary intoxication defense to any specific intent crime. The Comment to MPJI–Cr. 5:08 reconciles any apparent conflict between the erosion of the specific intent to kill with the non-erosion of second degree murder generally.

Voluntary intoxication can have the exculpatory effect on any crime requiring a specific intent. Thus, voluntary intoxication could negate guilt for criminal homicide of the specific-intent-to-kill variety at all levels of blameworthiness—first-degree murder, second[ ]degree murder, and voluntary manslaughter. *If voluntary intoxication has destroyed the capacity to form a specific intent to kill and thereby precluded a conviction of a specific-intent-to-kill homicide, the defendant may still be convicted of depraved heart second[ ]degree murder. The dissipation of the specific intent to kill does not take one down from a higher degree to a lower degree of the same kind of murder but rather it takes one down and over to a different kind of murder.* Hook v. State, 315 Md. 25, 29, 553 A.2d 233, 235 (1989); *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953); *see Brown v. State,* 90 Md.App. 220, 225–34, 600 A.2d 1126, 1128–33, *cert. denied,* 326 Md. 661, 607 A.2d 6 (1992); *Jones v. State,* 37 Md.App. 511, 378 A.2d 9, *cert. denied,* 281 Md. 739 (1977); *Bateman v. State,* 10 Md.App. 30[630], 272 A.2d 64, *cert. denied,* 261 Md. 721 (1971). Judge Moylan suggested the following doctrinal explanation: Intoxication can negate any specific intent including specific intent to kill and the specific intent to inflict grievous bodily harm. However, in murder, such conduct demonstrates the degree of consciousness of risk that establishes depraved heart murder, which is a general intent crime. *Cirincione,* 75 Md.App. at 170 n. 1, 540 A.2d at 1153–54 n. 1 (1988).

(Emphasis added.)

■ There is no indication that appellant in the case at hand was seeking to have the jury immersed in the doctrinal subtleties of how he might be guilty of one variety of second degree murder even if not guilty of another variety. He never asked for such an explanation. He never directed the court's

attention to the subtle doctrinal problem. He seemed, rather, to be of the mistaken belief that the preclusion of the specific intent to kill would, *ipso facto*, preclude a conviction of second degree murder generally. That, of course, is incorrect.

Our conclusion that appellant misperceives the law is fortified by the position he takes with respect to *Chisley v. State*, 202 Md. 87, 95 A.2d 577 (1953). *Chisley* was the first statement in our case law that, although voluntary intoxication may erode a deliberate and premeditated intent to kill, it "is not sufficient to reduce the killing from murder to manslaughter" and will not, therefore, preclude a conviction for murder in the second degree. *Id.* at 107, 95 A.2d 577.

*Chisley* is correct—as far as it goes. The only fault one might find with *Chisley* is that it was written one-half century ago, before our analysis of homicide law had reached its present level of sophistication and, understandably, did not provide an academically satisfying explanation for its holding. Appellant, however, takes the position that *Chisley* was not only unilluminatingly conclusory but was actually wrong, as he refers in his brief to "the weakness of the *Chisley* Rule" and argues that

> the logic of *Chisley* is no sounder than it was when first espoused and it is inconsistent with the later cases of [*State v.*] *Gover*, [267 Md. 602, 298 A.2d 378 (1973)], and *Avey* [*v. State*, 249 Md. 385, 240 A.2d 107 (1968)]. To the extent that voluntary intoxication may serve as a "defense," it negates evidence of the defendant having found a specific intent. Specific intent is a general concept applicable to all crimes. There is no basis for an exception for the specific intent variety of second degree murder.

*Chisley*, of course, did not say otherwise. *Chisley* did not say that, notwithstanding the erosion of a premeditated specific intent to kill, one could nonetheless possess a specific intent to kill at the second degree level. *Chisley* was written at a time when we still referred to the murderous *mens rea* in the singular and did not yet even recognize four distinct and alternate murderous *mentes reae*. *Chisley* simply held that a

conviction was not precluded for second degree murder generally, without going into any further explanation of how that could be. The explanation followed thirty-five years later in *Cirincione v. State,* 75 Md.App. 166, 171 n. 1, 540 A.2d 1151 (1988). *See Hook v. State,* 315 Md. 25, 29 n. 6, 553 A.2d 233 (1989).

Appellant mischaracterizes *Chisley* as creating a second degree murder "exception" to the rule that voluntary intoxication may erode any specific intent. *Chisley* did no such thing. *Chisley* was written at a time before we first began to discuss the difference between specific intent and general intent, let alone the applicability of the voluntary intoxication defense to the first but not the second. *See Avey v. State,* 249 Md. 385, 240 A.2d 107 (1968); *State v. Gover,* 267 Md. 602, 298 A.2d 378 (1973). *Chisley* never said that the permitted second degree murder conviction was of the specific intent to kill variety and an exception, therefore, to a general rule. The very existence of such issues had not yet dawned on anyone's consciousness.

 Quite aside from the failure of appellant to state distinctly what instruction he wanted, the instruction actually given fairly covered everything the jury needed to know. Properly instructed, the jury found that appellant was the homicidal agent and that the killing was neither justified nor excused. Even if it incorrectly found a superfluous specific intent to kill, the mere general intent to shoot the victim six times and the mere general intent to stab the victim twelve times rendered appellant unequivocally guilty of depraved heart second degree murder in any event. The multiple shootings and stabbings were indisputably reckless life-endangering acts. With respect to the consciousness of risk that is an element of depraved heart murder, Wayne LaFave and Austin Scott, *Criminal Law* (2d ed.1986), Sect. 7.4 "Depraved Heart Murder," p. 621, makes it clear that voluntary intoxication is no defense:

If his conduct causes death, should he escape murder liability? The person who unconsciously creates risk because he

[or she] is voluntarily drunk is perhaps morally worse than one who does so because he [or she] is sober but mentally deficient. At all events, the cases generally hold that *drunkenness does not negate a depraved heart by blotting out consciousness of risk,* and the Model Penal Code, which generally requires awareness of the risk for depraved-heart murder (and for reckless manslaughter), so provides.

(Emphasis added; footnotes omitted.)

Assuming, *arguendo,* a viable defense of voluntary intoxication, appellant's *mens rea* in the case *sub judice* did not come down from a premeditated specific intent to kill at the first degree level to a specific intent to kill at the second degree level. It, rather, came down and over to depraved heart second degree murder, which, in the circumstances of the instant case, was a necessarily subsumed general-intent variety of second degree murder to which voluntary intoxication would have been no defense. *Cirincione,* 75 Md.App. at 171 n. 1, 540 A.2d 1151; *Hook,* 315 Md. at 29 n. 6, 553 A.2d 233; *Brown v. State,* 90 Md.App. 220, 225–31, 600 A.2d 1126 (1992); *Banks v. State,* 92 Md.App. 422, 442–43, 608 A.2d 1249 (1992).

■ It was sufficient, therefore, for the jury to understand that voluntary intoxication was no defense to second degree murder. To have immersed the jurors in the doctrinal nuances of why it was no defense would have been not only unnecessary but confusingly counterproductive in the extreme. The jurors needed to be prepared to render a fair verdict, not to write a final examination paper.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**