943 A.2d 704 (2008)
179 Md. App. 32
Rory Howard WASHINGTON
v.
STATE of Maryland.
No. 938, Sept. Term, 2006.
Court of Special Appeals of Maryland.
March 6, 2008.
*707 Renee M. Hutchins and Yedidyah Charner, Baltimore, for Appellant.
Diane E. Keller (Douglas F. Gansler, Atty. General on the brief), Baltimore, for Appellee.
Panel: DAVIS, DEBORAH S. EYLER and JAMES S. GETTY, (retired, specially assigned), JJ.
DAVIS, Judge.
Appellant, Rory Howard Washington, was charged with seven counts, including attempted murder in the first degree, attempted murder in the second degree, assault in the first degree, assault in the second degree, illegal use of a handgun in the commission of a felony or crime of violence, illegal carrying or transporting of a handgun and illegal possession of a regulated firearm, respectively.
After a three-day trial beginning on March 20, 2006, a jury sitting in the Circuit Court for Baltimore City found appellant guilty, inter alia, of counts three through seven, but acquitted appellant of attempted first-degree murder. The jury deadlocked on the count charging attempted second-degree murder.[1]
On June 6, 2006, the court sentenced appellant to the jurisdiction of the Division of Corrections for a period of twenty years for his conviction of assault in the first degree.[2] Appellant was also sentenced to fifteen years for use of a handgun in the commission of a crime of violence, three years for illegally carrying a handgun and five years for possession of a regulated firearm, these sentences to run concurrent with the twenty-year sentence for assault.
This appeal was thereafter timely noted, in which appellant presents the following issues for our review:
1. Whether the trial court improperly admitted a videotape which purported to be a recording of the events surrounding the shooting, where that videotape was never properly authenticated.
2. Whether the trial court improperly admitted a detective's lay opinion *708 testimony implicitly identifying appellant in the videotape which purported to depict the events surrounding the shooting.
3. Whether [appellant's] jury was inappropriately pressured into reaching a verdict by the trial court's premature, repetitive and improperly worded Allen[[3]] charges.
4. Whether [appellant's] conviction for possession of a regulated firearm must be reversed where proof of the size of the firearm is a necessary element of the offense and the State failed to produce any evidence that [appellant] possessed a gun smaller than sixteen inches.
For the reasons that follow, we resolve the issues in favor of the State and, accordingly, affirm the judgment of the Circuit Court for Baltimore City.

FACTUAL BACKGROUND
During the evening of June 23, 2005, Jermaine Wright frequented Jerry's Bar, a bar and liquor store, located at 604 Poplar Grove Street in Baltimore City. At approximately 10:00 p.m., Wright stepped outside of Jerry's Bar and was shot. A bullet entered the right-side of Wright's stomach and became lodged in his spinal cord, resulting in L3 spinal cord injury.
After arriving on the scene, police officers found narcotics on Wright's person and recovered a pink hat that was later determined to belong to Wright. Pursuant to police investigations, Wright told the officers that he did not know his assailant, but described him as "a black male," having a "thick build" and "wearing a white T-shirt." Wright also told the officers that he did not see the weapon used to shoot him.
Appellant was subsequently apprehended for the shooting of Wright and was charged under the seven counts set forth, supra. The lead detective working Wright's case, Carlos Vila, met with Wright on three separate occasions, including the day before trial, in an effort to identify his assailant. On those different occasions, Wright either refused to view the photo array that Detective Vila had prepared or claimed that he needed more time.
Appellant's trial began on March 20, 2006 and spanned three days. Despite Wright's failure to identify appellant prior to trial, Wright testified that he and appellant had an argument. Appellant subsequently left Jerry's Bar, returned ten minutes later and asked Wright to step outside. Believing that appellant wanted to "rumble," Wright followed appellant out of the bar. According to Wright, once outside of Jerry's Bar, appellant "whipped out his gun and shot [him]," and everything "happened real fast."
After unequivocally identifying appellant, whom he had known for three years, as the man who shot him, Wright explained his reasoning for not coming forward until trial. He said: "I wanted [appellant] to still be out there because, you know, I was going to take advantage myself. I was going to get him." "I was so mad and angry I wanted  you know, I was going to deal with it myself." Wright testified that, although he was still "mad," he decided to come to court because he thought "it's best."
An employee of Jerry's Bar, Charles Burrell, however, recounted a different version of events that occurred during the night of June 23, 2005. According to Burrell, a man named "E" and Wright engaged in a fight at approximately 9:00 p.m. *709 Burrell broke up the fight and "put the guy named `E' out of the bar." Burrell then told Wright to sit in a chair, while he (Burrell) went next door to pick up food that he had ordered. While Burrell was waiting for his food, he heard gun shots. Burrell ran outside to find Wright "at the front door of Jerry's Bar laying down on the ground."
The State pointed out that, contrary to his trial testimony, Burrell had told police that he saw appellant on the day of the shooting. After refreshing Burrell's recollection with his taped statement to police, Burrell agreed that appellant "had been in and out" of the bar. Burrell additionally testified that appellant is known to wear a white T-shirt on his head "like he an Arab or something."
Gregory Jennings confirmed Burrell's testimony that appellant always wore a T-shirt or towel around his head. Jennings also agreed that, on the day after the shooting, he identified appellant's photograph for the police. On the back of a photograph, Jennings wrote and signed that "[he] saw [appellant] outside arguing with [Wright]." At trial, however, Jennings claimed that it was his understanding that he was not free to leave during police questioning until he provided a statement to police. He further claimed that police officers informed him of what to say in his statement.
During appellant's trial, the State presented the testimony of Detective Vila regarding his investigation. Detective Vila testified that, once he discovered that David Kim, the owner of Jerry's Bar, had installed eight surveillance cameras, he requested a copy of the footage. Kim, however, did not know how to extract data from the computerized system and, in turn, called a "technician" to transfer the recorded data to a compact disc. Thereafter, Kim provided the disc to Detective Vila, which was later converted to VHS. The State offered the videotape and excerpted photographic stills therefrom into evidence. Over appellant's specific objection that the videotape lacked proper authentication, the court allowed the State to play the videotape in the courtroom and permitted the jury to view the videotape during its deliberations. Additionally, Detective Vila conveyed to the jury his observations of the still photographs. Appellant takes issue with the detective's testimony, claiming that he repeatedly "implied" that an individual pictured in the photographs was appellant.
After hours of deliberation, the jury returned its verdict. As noted, appellant was found guilty of first-degree assault, second-degree assault, use of a handgun in a felony or crime of violence, possession of a regulated firearm and illegally carrying a handgun. Appellant was acquitted of attempted first-degree murder. The jury, despite an Allen charge, remained deadlocked on the charge of attempted second-degree murder.
Additional facts will be discussed as warranted throughout our analysis.

ANALYSIS

I
Appellant initially argues that the videotape of the surveillance footage taken from Jerry's Bar was not properly authenticated. Specifically, he argues that, pursuant to the "silent witness" theory of authentication, the State failed to present sufficient evidence describing the process that produced the videotape and excerpted still photographs therefrom. To the extent preserved, the State contends that it presented sufficient evidence to permit a reasonable jury to infer that the videotape is an accurate recording of events surrounding the shooting.
*710 Preliminarily, the State argues that appellant's specific contention that the State failed to establish if and how the videotape was "edited" is unpreserved for appellate review. At trial, Kim testified that the computerized surveillance system of Jerry's Bar records automatically, twenty-four hours a day. To provide Detective Vila with the footage of the shooting, Kim asked a "technician" to transfer the data from the system to a compact disc because he did not know how to do so himself. A compact disc was subsequently provided to Detective Vila that night.[4]
Appellant objected to the admittance of the videotape into evidence, arguing that the State failed to present testimony of someone familiar with the computer generated system. Thus, he asserts that "there's a hole that's not filled" regarding the copying of the computer data onto compact disc. On appeal, appellant contends that, "without specific evidence describing how the video data recorded from multiple cameras was transferred and compiled into a single viewable format, and how the portions of the video admitted into evidence were edited, a trial court could not know whether the video was presented in a manner which significantly altered the accuracy of the tape." Because appellant failed to explicitly mention the possibility of "editing" to the trial court, the State argues that the trial judge "would have no reason to suspect that any `editing' had occurred and could not have considered this aspect of the current claim in its ruling."
"To preserve an issue for appellate review, it must first have been presented, with particularity, to the trial court." Jordan v. State, 82 Md.App. 225, 244, 571 A.2d 238 (1990), aff'd in part, rev'd in part on other grounds, 323 Md. 151, 591 A.2d 875 (1991); Harmony v. State, 88 Md.App. 306, 317, 594 A.2d 1182 (1991) (opining that "[a]n offhand remark that the `statute of limitations or something like that' might `come into play' is simply not particular enough to allow appellate review"). A party is required to "bring his argument to the attention of the trial court with enough particularity that the court is aware first, that there is an issue before it, and secondly, what the parameters of the issue are." Harmony, 88 Md.App. at 317, 594 A.2d 1182. The trial court needs sufficient information to allow it to make a thoughtful judgment. Id.
Appellant's repeated general objections that the videotape lacked authentication encompasses his specific contention of "editing" on appeal. Appellant brought the issue of authentication to the trial court's attention by pointing to the gap in testimony and arguing that "someone familiar with the computer generated system" needed to testify to "the copying from the system onto CD_ROM or CD  a DVR or whatever." Clearly, the issue before the trial court was the lack of testimony regarding how data from eight different cameras, feeding into the computer generated system, was compiled into a single viewable format. The fact that "editing" may have been required is reasonably implied by the objection raised below. See Sifrit v. State, 383 Md. 116, 857 A.2d 88 (2004). Thus, the issue of "editing" is properly before this Court.
Addressing the merits, videotapes are generally admissible in evidence on the same basis as motion picture films and are subject to the same general rules applicable to photographic evidence. Dep't *711 of Pub. Safety & Corr. Servs. v. Cole, 342 Md. 12, 20, 672 A.2d 1115 (1996) (Cole II);[5]Tobias v. State, 37 Md.App. 605, 615, 378 A.2d 698 (1977). Photographs may be admissible under one of two distinct rules. Typically, photographs are admissible to illustrate testimony of a witness when that witness testifies from first-hand knowledge that the photograph fairly and accurately represents the scene or object it purports to depict as it existed at the relevant time. Cole II, 342 Md. at 21, 672 A.2d 1115 (This method of authentication is known as the "pictorial testimony" theory.); see also 6 Lynn McLain, Maryland Evidence § 901.2, at 491 (1987). There is a second, alternative method of authenticating photographs that does not require first-hand knowledge. The "silent witness" theory of admissibility authenticates "a photograph as a `mute' or `silent' independent photographic witness because the photograph speaks with its own probative effect." Cole II, 342 Md. at 21, 672 A.2d 1115; see also Sisk v. State, 236 Md. 589, 591-92, 204 A.2d 684 (1964).
Professor Wigmore, explaining the rationale behind this theory, has stated:
With later advancements in the art of photography . . . and with increasing awareness of the manifold evidentiary uses of the products of the art, it has become clear that an additional theory of admissibility of photographs is entitled to recognition. Thus, even though no human is capable of swearing that he personally perceived what a photograph purports to portray (so that it is not possible to satisfy the requirements of the `pictorial testimony' rationale) there may nevertheless be good warrant for receiving the photograph in evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph should then be received as a so-called silent witness or as a witness which `speaks for itself.'
Cole II, 342 Md. at 21-22, 672 A.2d 1115 (citing 3 Wigmore on Evidence § 790, at 219-220 (Chadbourn rev.1970)) (emphasis added). Under the silent witness doctrine, "photographic evidence may draw its verification, not from any witness who has actually viewed the scene portrayed on film, but from other evidence which supports the reliability of the photographic product. . . ." Cole II, 342 Md. at 22, 672 A.2d 1115 (citing 2 McCormick on Evidence § 214, at 15).
Appellant argues that the State attempted to authenticate the videotape and still photographs therefrom, pursuant to the silent witness theory. He contends, however, that the "scant evidence" adduced at trial regarding the process that produced the videotape stands in stark contrast to the detailed testimony that the Court of Appeals concluded warranted admissibility in Sisk v. State, supra and Cole II, supra.
The Court in Sisk relied upon the "silent witness" theory over forty years ago to uphold the admission of a Regiscope photograph.[6] In its prosecution of James Sisk for obtaining money by false pretenses, the State entered into evidence a Regiscope photograph that showed Sisk passing the check, the identification Sisk used in passing the check and the check itself. By presenting evidence that showed when, *712 where and under what circumstances the picture was taken, the State laid an adequate foundation for admissibility.
William Shraver, Chief Investigator for Montgomery Ward, testified that, after receiving an unpaid check, he removed the film from the store's Regiscope camera. Id. at 594, 204 A.2d 684. He then sent the film, by mail, to the "Regiscope Company," with a description of the check and the Bates number thereon and requested a photograph. The returned photograph was admitted into evidence. The bottom part of the photograph was a picture of the person cashing the check, while the top part was a picture of the check and the identification used to cash the check. Id.
Marian Stevens, head cashier of Montgomery Ward, testified that she and her assistants cashed approximately twenty-five to thirty checks on the day in question and that they had each operated the Regiscope machine on many occasions. Id. at 595, 204 A.2d 684. Stevens explained to the court the location of the machine in the store and how a picture is taken.
Joseph Slattery, an employee of Regiscope, demonstrated for the court, in detail, how the camera worked. Id. Slattery additionally explained how his company processed and stored the film. After examining the roll of developed film in the film reader and finding the negative of the "particular transaction," he testified that the enlargement was a true representation of the negative. Id. According to Slattery, the film used in taking Regiscope pictures is perforated on one side only, so that the film "cannot be put in reverse." Id. at 596, 204 A.2d 684. Therefore, on the finished picture, the check is always above the person's picture.
The detailed explanation of the operation of the Regiscope camera made "the possibility of error in the photograph almost nil, in the absence of some intentional trickery to `fake' the photograph" and, thus, the court held that the negative and enlargement thereof accurately portrayed the subjects illustrated. Id.
Thirty years after Sisk, the Court of Appeals in Cole II, supra, applied the "silent witness" principle to videotape evidence. The videotape at issue showed a disruptive inmate being extracted from a prison cell and was offered at an administrative hearing for termination of employment of a correctional officer who had participated in the extraction. The Department, however, did not produce a witness who was present at the extraction to testify to the videotape's accuracy. Thus, in an effort to authenticate the videotape pursuant to the "silent witness" theory, the prison warden testified that cell extractions are ordinarily videotaped and routinely labeled with the date and time of the extraction and the names of the inmate and officers involved. Cole II, 342 Md. at 27, 672 A.2d 1115. (The warden was competent to testify as to the routine practices of the prison under Md. Rule 5-406); see Md. Rule 5-406 (2007) ("Evidence of the . . . routine practice of an organization is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice."). According to the warden, the videotapes are kept in an individual envelope and are stored in a security vault at the institution, where they may be viewed only by signing in and out on a chain of custody form. Cole II, 342 Md. at 27, 672 A.2d 1115.
Based on the totality of the circumstances, the Court held that the videotape was sufficiently authenticated. Id. Applying the "silent witness" theory to videotape evidence for the first time, the Court declined to adopt any rigid, fixed foundational requirements for authentication, reasoning *713 that the facts and circumstances surrounding the making of photographic evidence and its intended use at trial will vary from case-to-case. Id. at 26, 672 A.2d 1115. Thus, the Court left the trial court with "some discretion in determining what is an adequate foundation" so long as the foundation laid assures the accuracy of the process producing the photographic evidence. Id. at 26-27, 672 A.2d 1115; see also Md. Rule 5-901(a) (2007) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").
It is clear from Sisk and Cole II that the governmental entities utilized the silent witness theory so that the Regiscope photograph and videotape "spoke for themselves," rather than "solely to add to or illustrate the testimony of a human witness." Cole II, 342 Md. at 23, 672 A.2d 1115 (emphasis added). In Sisk, the State's entire case rested upon the Regiscope photograph. By comparison, in Cole II, the Department did not produce a witness who was present at the cell extraction to testify as to the accuracy of the videotape. Because it was undisputed that Cole was depicted in the videotape, see Cole II, 342 Md. at 27, 672 A.2d 1115, the Department's primary objective in showing the videotape was to demonstrate that Cole committed actions that warranted his dismissal. Accordingly, the application of the silent witness theory hinges, in large part, on the proponent's purpose in entering the videotape or photograph into evidence.
Undeniably, the State's purpose for showing the videotape of the surveillance footage in the case sub judice was to place appellant at the scene of the shooting. Cf. Cole II, 342 Md. at 27, 672 A.2d 1115 (where the videotape showed the commission of improper conduct and not that Cole was present at the time of the cell extraction). To completely resolve the issue before us, however, we must also determine whether the videotape was probative evidence that appellant was at the scene of the crime or whether the images portrayed by the videotape added to the testimony of the State's witnesses.
The State elicited testimony from three witnesses who were present in Jerry's Bar on the night of the shooting. Its primary witness, Wright, unequivocally identified appellant as the individual who shot him. The other two witnesses, Burrell and Jennings, testified that appellant frequented Jerry's Bar that evening. Prior to appellant's trial, including the day before trial, however, Wright had failed to identify his assailant. We may not assume, however, that the State was uncertain as to whether Wright would testify that appellant was the shooter or place him at the scene of the shooting when he was called to testify.[7] Sequentially, the State produced Wright as a witness only after the State had called Detective Vila and introduced the videotape and still photographs therefrom through his testimony. See infra Part II. It was subsequent to Vila's testimony that Wright was called to testify during which he identified appellant as the individual who shot him. Thus, irrespective of the order in which the witnesses were called to testify, the net effect of the videotape served to bolster Wright's credibility and corroborate his testimony that, not only was appellant present at the scene of the shooting, but that appellant had shot him. *714 See Cole II, 342 Md. at 24, 672 A.2d 1115 (citing Fisher, 643 S.W.2d at 573-75) (Photographic evidence is the best available means of preserving the appearance of a scene at a given time and because "[e]yewitness testimony is subject to errors in perception, memory lapse, and a witness' problem of adequately expressing what he observed in language so that the trier of fact can understand," photographic evidence is superior to eyewitness testimony in certain respects.).[8]
The purpose for which the videotape was offered in the instant case thus differs from the purpose for which the videotape and photographs were offered in Sisk, Cole II and cases from other jurisdictions, in which there was no testimony from a witness capable of swearing that he or she personally perceived what the videotape or photograph purported to portray. Cf. Brooks v. Virginia, 15 Va.App. 407, 424 S.E.2d 566, 569 (1992) (videotape of a drug transaction between Brooks and a police informant, where the State authenticated the videotape by showing that tabs allowing alteration of the tape were removed and that the videotape contained an on-screen display of the seconds that had passed and by presenting testimony of three police officers who verified that the voice on the tape was that of Brooks even though none of the officers testifying actually observed the drug transaction taking place); Fisher v. Arkansas, 7 Ark.App. 1, 643 S.W.2d 571, 573 (1982) (holding that the trial court properly admitted a surveillance videotape of a grocery store after the store's owner testified that, prior to the time the defendant entered the store, he had adjusted the camera, began recording, checked that it was working properly and then left the premises whereupon the unattended camera captured video of Fisher and her daughters "sacking groceries, and removing them"); see also United States v. Pageau, 526 F.Supp. 1221, 1224 (N.D.N.Y.1981) (testimony as to installation, activation, operation and chain of possession of videotape depicting correctional officers beating inmate was sufficient foundation); Maine v. Young, 303 A.2d 113, 116 (Me.1973) (testimony as to installation, testing and custody of film from bank's automatic camera justified admission of film as independent evidence).
In the above cited cases, the photographs or videotapes were real evidence. See Joseph F. Murphy, Jr., Maryland Evidence Handbook § 1103 at 445 (3d ed. 1999) (Real evidence are those tangible items that are actually part of the facts being presented and not mere visual aids). Former Chief Judge Murphy of this Court explained that, "Like an X-ray, an [unattended] surveillance photograph that positively identifies a burglar or robber is `real,' not `demonstrative' evidence" and "[s]uch a photograph is not admissible as a visual aid because nobody can testify that it fairly and accurately shows what he saw." See Cole II, 342 Md. at 22, 672 A.2d 1115 (Although no one who can testify from direct observation inside the body, x-ray photographs are admissible, pursuant to the silent witness theory, because they accurately represent what they purport to show).
Wright's testimony reveals that he personally perceived the images portrayed by the surveillance footage. See 3 Wigmore on Evidence § 790, at 219-20. ("Even though there is no human capable of swearing that he personally perceived *715 what a photograph purports to portray (so that it is not possible to satisfy the requirements of the `pictorial testimony' rationale) there may nevertheless be good warrant for receiving the photograph into evidence."). Consequently, appellant's case does not, technically, fall within the silent witness rule.
Authentication of the videotape of the surveillance film is required, however, in any event. Regarding authentication, we said in Cole I:
In 5 Lynn McLain, Maryland Evidence § 403.6 (1987), Professor McLain discusses the admission of movies, video tapes, and sound recordings. She points out that `the courts suspect that movies and tapes may be easily manipulated, through such means as editing and changes of speed, to produce a misleading effect.' Id. at 322 (footnote omitted). She states that the modern trend is to require `that a person with first-hand knowledge of the subject of the movie or video tape testify that it is a fair and accurate portrayal of the subject.' Id. at 322, citing, among others, Tobias, 37 Md.App. 605, 378 A.2d 698 (1977), and McCormick on Evidence § 214. 2 John W. Strong, McCormick on Evidence § 214 (4th ed.1992) states: `[A] photograph is viewed merely as a graphic portrayal of oral testimony, and becomes admissible only when a witness has testified that it is a correct and accurate representation of relevant facts personally observed by the witness.' Id. at 13 (footnote omitted). 3 Charles C. Scott, Photographic Evidence § 1294 (2d ed.1969), says, relative to video tapes, `[V]ideo tape recordings should be admitted in evidence and played back for court and jury on the same basis as ordinary motion pictures on film, subject only to the usual showing of relevancy and materiality and to proper verification.' Id. at 152 (emphasis added).
Cole I, 103 Md.App. at 133, 652 A.2d 1159. See Cole II, 342 Md. at 24, 672 A.2d 1115 ("Photographic evidence is admissible where its authenticity can be sufficiently established in view of the context in which it is sought to be admitted.").
The State failed to lay an adequate foundation assuring the accuracy of the process that produced the videotape and, thus, the trial court abused its discretion in permitting the admission of the videotape and still photographs therefrom into evidence. Kim testified that the computerized system at Jerry's Bar is comprised of eight cameras, with six cameras located inside of the bar and two cameras located outside of the bar. According to Kim, the system is "almost hands-free" and records constantly, twenty-four hours a day, depending "on the activity of the movement." On the night of the shooting, Kim received a telephone call from Detective Vila, asking him to come to Jerry's Bar and provide police with the surveillance footage in issue. Unable to transfer the data from the computer system to a compact disc himself, Kim asked a "technician" to transfer the data. A compact disc was provided to Detective Vila that night.
The eight cameras recorded automatically onto a computerized system, but the data was transferred onto one rather than eight different discs. There was no testimony describing how the recordings from eight different cameras were compiled into a single viewable format. It was necessary for the "technician" or someone possessing expertise or knowledge of the computerized system and how the data is transferred therefrom to explain whether the videotape was edited and, if so, how it was edited. Despite the fact that the date and time is displayed, the lack of evidence regarding the process of transferring the *716 data from the computerized system to compact disc leaves open the possibility of distortion. See 5 Lynn McLain, Maryland Evidence § 403.6 at 322 (1987) (pointing out that "the courts suspect that movies and tapes may be easily manipulated, through such means as editing and changes of speed, to produce a misleading effect."). Because of the lack of extrinsic evidence showing under what circumstances the surveillance footage was transferred to a compact disc, the trier of fact could not reasonably infer that the subject matter is what the State claims it to be and, thus, the videotape was not sufficiently authenticated.
Nevertheless, we are of the view that the trial court's error in admitting the videotape and still photographs therefrom was harmless beyond a reasonable doubt. See Dorsey v. State, 276 Md. 638, 648, 350 A.2d 665 (1976) ("In those circumstances where a violation of a right protected by the Federal Constitution occurs, the Supreme Court, as the ultimate arbiter in interpreting and implementing constitutional guarantees, has declared such error to be `harmless,' where, upon a review of the evidence offered the [C]ourt [is] able to declare a belief that it was harmless beyond a reasonable doubt.") (internal citation omitted) (alterations in Dorsey); see also Spain v. State, 386 Md. 145, 161, 872 A.2d 25 (2005) (citing Dorsey in finding harmless error beyond reasonable doubt).
Although appellant and the State, in closing arguments, declared that the "tape [was] the best evidence," the gravamen of the State's case was Wright's unequivocal identification of appellant as the man who shot him. According to Wright, on the night of the shooting, Wright and appellant engaged in an altercation inside of Jerry's Bar. Thereafter, appellant asked Wright to step outside of Jerry's Bar to "rumble." Wright testified that, once outside of the bar, appellant "whipped out his gun and shot [him]," and that everything "happened real fast."
The most important aspect of Wright's direct-examination was his testimony that he had known appellant for approximately three years. On the night of June 23, 2005, he argued with appellant face-to-face and immediately followed appellant outside to continue their fight, whereupon he was shot. From the testimony elicited at trial, there was nothing concealing appellant's identity. Thus, Wright was able to positively and accurately identify appellant as the shooter.
Appellant, however, takes issue with Wright's conclusive identification, pointing to the fact that Detective Vila met with Wright on three separate occasions, including the day before trial, in an effort to have Wright identify his assailant. On those different occasions, Wright either refused to view the photographic array that Detective Vila had prepared or claimed that he needed more time. During the trial, Wright provided a plausible explanation for his failure to identify appellant until the trial. He explained: "I wanted [appellant] to still be out there because, you know, I was going to take advantage myself. I was going to get him." He also said: "I was so mad and angry I wanted  you know, I was going to deal with it. myself." Wright testified that, although he was still "mad," he decided to come to court because he thought "it's best."
Additionally, Jennings, who "helps [Jerry's Bar] out," saw Wright and appellant inside of the bar on the night of the shooting. He testified that Wright, whom he had known as "Juice,"[9] "had a few words *717 with a couple guys in the bar and [appellant] was one of them." According to Jennings, at some point, Wright and appellant went outside of the bar. Moreover, in a statement to police, Jennings identified appellant's photograph and wrote on the back of the photograph, "I saw [appellant] outside arguing with Juice" and signed his name. During trial, however, Jennings claimed that police officers told him what to write in his statement and refused to allow him to leave the station until he gave that statement. Burrell, after the State refreshed his recollection with his taped statement to police, confirmed the testimony of Jennings by testifying that appellant "had been in and out" of Jerry's Bar on the evening of the shooting.
Upon our independent review of the record, we can affirmatively say beyond a reasonable doubt that the trial court's error in admitting the videotape and still photographs without proper authentication did not in any way influence appellant's verdict. Lawson v. State, 389 Md. 570, 581, 886 A.2d 876 (2005). The videotape and still photographs added to or illustrated the testimony of Wright, Burrell and Jennings and, thus, in our view, the jury would have found appellant guilty without reliance on the improperly admitted evidence. Because the error "probably" did not affect the jury's verdict, a reversal is not warranted. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (Non-constitutional errors require reversal only when the error "substantially" or "probably" affected the jury's verdict and, thus, to put it another way, only when there is no probability that the jury's verdict would have been different is the error harmless).

II
Appellant next complains that the trial court compounded the error of improperly admitting the videotape and still photographs therefrom by allowing Detective Vila, who was not present at the time of the shooting "to repeatedly imply that an individual in the videotape and photographs excerpted from the video was [appellant]."[10] The State responds that the trial court properly exercised its discretion in allowing the detective to relate his observations regarding the videotape and still photographs therefrom to the jury, while expressly precluding the detective from identifying appellant as one of the individuals depicted.
Pursuant to Maryland Rule 5-701, "If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Id.; see also Goren v. United States Fire Ins. Co., 113 Md.App. 674, 688 A.2d 941 (1997) (The two requirements of this Rule are conjunctive.).
The requirement that the lay opinion testimony be helpful to the trier of fact precludes a lay witness from offering conclusions and inferences that the jury is capable of making on its own when analyzing the evidence. See Baltimore & Y. Turnpike Road v. Leonhardt, 66 Md. 70, *718 77, 5 A. 346 (1886) ("[W]here the question can be decided by such experience and knowledge as are ordinarily found in the common business of life, the jury [is] competent to draw the inferences from the facts without having the opinions of witnesses."); Bey v. State, 140 Md.App. 607, 781 A.2d 952 (2001) (reaffirming the century-old rule that a lay witness may not testify as to matters that the jury is capable of deciding itself). Thus, a lay witness is not qualified to express an opinion about matters "which are either within the scope of common knowledge and experience of the jury or which are peculiarly within the specialized knowledge of experts." Bey, 140 Md.App. at 623, 781 A.2d 952 (citing Rosenberg v. State, 129 Md.App. 221, 254, 741 A.2d 533 (1999), cert. denied, 358 Md. 382, 749 A.2d 173 (2000)).
Permissible lay opinion testimony generally falls into one of two categories. The first category is "where it is impossible, difficult, or inefficient to verbalize or communicate the underlying data observed by the witness." Robinson v. State, 348 Md. 104, 119, 702 A.2d 741 (1997); Brown v. Rogers, 19 Md.App. 562, 568-69, 313 A.2d 547 (1974) (opining that a mother's testimony that, after her child was struck by the defendant's car, the child was in "great pain" was permissible because all of the transient physical conditions which the mother observed, including tone of voice, expression of the face and movement of the limbs could not be reproduced for the jury in such precision and fullness as to impress the jury in the same manner as the mother was impressed).
The second category is when the "the lay trier of fact lacks the knowledge or skill to draw the proper inferences from the underlying data." Robinson, 348 Md. at 120, 702 A.2d 741 (citing Edward J. Imwinkelried, Evidentiary Foundations 241 (3rd ed.1995)). In regard to the latter category, Maryland recognizes that law enforcement officials often have specialized training and experience to justify permitting them to offer testimony in the form of a lay opinion. Bey, 140 Md.App. at 624, 781 A.2d 952. "To restrict such testimony to underlying factual observations would often deprive the trier of fact of the necessary benefit of the percipient mind's prior experiences." Robinson, 348 Md. at 120, 702 A.2d 741. These "prior experiences would be a sine qua non to a full understanding of the underlying factual data." Id. at 120, 702 A.2d 741; see also Tu v. State, 97 Md.App. 486, 501, 631 A.2d 110 (1993), aff'd on other grounds, 336 Md. 406, 648 A.2d 993 (1994).
In Robinson v. State, supra, two State troopers testified as lay witnesses and expressed the opinion that, based on their training and experience, the alleged contraband was in fact crack cocaine and not simply that the disputed substance looked like crack cocaine. Id. at 120-21, 702 A.2d 741 (emphasis supplied). The troopers did not possess sufficient personal knowledge to give such an opinion. Although the record indicated that the troopers had training and experience enabling them to perceive the visual characteristics of suspected cocaine, there was no showing that they had the necessary training and experience to identify accurately the chemical nature of that substance. Id. at 121-23, 702 A.2d 741. Moreover, the troopers' testimony was not helpful to the trier of fact. Id. at 128, 702 A.2d 741 (Lay opinion must be based "on probability and not on mere possibility."); see also Kujawa v. Baltimore Transit Co., 224 Md. 195, 203-04, 167 A.2d 96 (1961). For these reasons, the Court of Appeals held that the State troopers' testimony was inadmissible lay opinion.
Our decision in Goren v. United States Fire Ins. Co., 113 Md.App. 674, 688 A.2d *719 941 (1997), is also instructive. In Goren, a State trooper testified as a lay witness to events that occurred during a car accident. Specifically, he testified that Barbara Goren never applied her brakes during the accident, that her vehicle left the roadway twice and that, after she struck the construction barrel, she had two wheels on the grass, before returning to the northbound lane. Id. at 678, 688 A.2d 941. The trooper further testified that Goren's car did not make any 360 degree revolutions. The trooper's opinions were not based upon events that he had witnessed and exceeded a recitation of facts that he observed at the scene. Id. Moreover, the trooper's opinions were not helpful to the jury within the meaning of the rule, because they were the type of opinions that required expertise in accident reconstruction, which the trooper admittedly did not possess. Id.; see also Bruce v. State, 328 Md. 594, 630, 616 A.2d 392 (1992) (articulating that historically non-expert opinions have been excluded from evidence in areas in which only an expert could reach a rational conclusion).
We said in Goren: "[W]hen . . . the [lay] witness is `pulling together' his observations and is therefore testifying to conclusions, the trial judge should not admit such testimony." Goren, 113 Md.App. at 687, 688 A.2d 941 (citing Joseph F. Murphy, Jr., Maryland Evidence Handbook § 603(B), at 328 (1993)); see also In re Nawrocki, 15 Md.App. 252, 289 A.2d 846 (1972) (opining that officer's testimony that a juvenile used "profane" language was conclusory and that it was for the trier of fact to determine if the language was "profane"). Accordingly, we held that the trooper's opinions were not properly admitted as lay opinion testimony. See also Ragland v. State, 385 Md. 706, 725, 870 A.2d 609 (2005) (holding that police officers must be qualified as experts before testifying to opinions that are based on specialized training and knowledge.).
In the case sub judice, Detective Vila, a twelve-year veteran of the Baltimore City Police Department, testified on behalf of the State about his investigation. During the State's direct examination, a videotape and a series of still photographs thereof were shown to Detective Vila and the court. As Detective Vila watched the videotape with the jury, he narrated the action that had been captured. The State then questioned the detective regarding his observations of several still photographs. Appellant takes issue with Detective Vila's testimony, claiming that he "implicitly" identified appellant.
Detective Vila informed the court that the photographs marked as "State's Exhibit's 2A", "2B," "2D" and "2E," were all recorded at 8:23 p.m. inside of Jerry's Bar.[11] According to Vila, one of the individuals pictured in 2A wore a white T-shirt, blue jeans and a T-shirt or rag on his head. While testifying to his observations of the still photograph marked "2B," the State asked, "What, if any observations did you make regarding the shoes of the Defendant?" The court sustained appellant's objection to the State's reference of the individual as the "Defendant." The court, over appellant's objections, however, allowed the State to question Detective Vila regarding his observations of the individual.[12] Later, the detective testified that, in the photograph labeled "2D," the individual had a goatee and was seen wearing a *720 large watch on his left wrist and another piece of large jewelry on his right wrist. According to Detective Vila, photograph 2E depicts "the backside of the same individual we discussed on 2D."
The State also showed Detective Vila photographs marked as "State's Exhibit 2C" and "21" that were taken at 9:52 p.m. inside of Jerry's Bar, moments before the shooting. The detective informed the jury that the individual depicted is the "same individual depicted in photograph 2A and 2B, but without a rag or T-Shirt on his head." Detective Vila later testified that the individual in 21 is "the same individual [he] saw on 2C, this time with no bandanna or head gear and a watch on the left wrist, shoelaces on the shoes hanging out."
Additionally, Detective Vila informed the jury that the photograph marked as "State's Exhibit 2G," which was recorded at 9:53 p.m. outside of Jerry's Bar, depicted an "individual wearing a pink hat falling to the ground" and an "individual wearing a white T-shirt, the blue jeans at a distance [sic]."
Appellant argues that, because the State presented witnesses who testified that appellant was known to wear a T-shirt or rag on his head, Detective Vila was essentially allowed to testify that appellant was at the scene of the shooting. Appellant's argument is without merit. The State presented relevant testimony to make its case and stopped short of asking the detective whether the individual shot Wright or was appellant. Accordingly, Detective Vila's testimony consisted primarily of underlying factual observations. Cf. Robinson, 348 Md. at 120-21, 702 A.2d 741 (concluding that the troopers' opinions that the alleged contraband "was in fact" crack cocaine was improper lay opinion); Goren, 113 Md.App. at 678, 688 A.2d 941 (opining that the trooper's opinion exceeded a recitation of facts to make specific conclusions about the accident beyond his expertise).
Furthermore, appellant cites no authority to support his contention that the trial court erroneously permitted the detective to make an "implicit" identification. Instead, appellant relies on case law from other jurisdictions regarding the admissibility of witness testimony explicitly identifying an individual pictured in a photograph or videotape as the defendant. See, e.g., Robinson v. Colorado, 927 P.2d 381 (Colo.1996); United States v. Jackman, 48 F.3d 1 (1st Cir.1995); Massachusetts v. Austin, 421 Mass. 357, 657 N.E.2d 458 (1995); United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir.1993); United States v. Allen, 787 F.2d 933 (4th Cir. 1986); vacated and remanded, 479 U.S. 1077, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987).
The detective, however, did testify that the individual pictured in the photographs taken at 9:52 p.m. was the same individual pictured in the photographs taken at 8:23 p.m., but without a rag or T-shirt on his head. Assuming, arguendo, that this testimony constituted an "opinion," the trial court did not abuse its discretion. See Md. Rules 5-104(a) & 5-403 (2007); Tate v. State, 176 Md.App. 365, 409, 933 A.2d 447 (2007) (articulating that, generally speaking, trial courts are afforded broad discretion in the conduct of trials and in determining the reception of evidence). To be permissible lay opinion, the detective's opinion must have been rationally based and helpful to the jury. Md. Rule 5-701.
The State claims that the detective's testimony was helpful to the jury because the detective explained his observations in reference to his investigation. Appellant, however, insists that, in light of the videotape and photographs shown during trial and also available during deliberations and considering that appellant was seated in *721 the courtroom, the jury possessed the knowledge and skill to draw its own inferences from the photographs. It is for this same reason, however, that the detective's testimony was harmless. Cf. Goren, 113 Md.App. 674, 688 A.2d 941 (holding that the trial court's error in allowing the trooper who investigated the accident scene to be cross-examined as to his opinions on how events occurred, despite the fact that he was not qualified to offer lay opinion testimony, was not harmless on the basis that the testimony concerned only the driver's contributory negligence, and not alleged negligence of the defendants, but rather warranted grant of new trial; the jury could have used the trooper's testimony to resolve issues of defendants' primary negligence). Additionally, both counsel and the court made clear to the jurors that it was their responsibility to determine the identity of the individual pictured in the surveillance footage.
The trial court, in our judgment, did not abuse its discretion in permitting lay opinion testimony.

III
Appellant assigns error to the trial court's issuance of "improper, repetitive, and improperly worded Allen[13] charges to the jury." Specifically, appellant argues that, because the jury had neither indicated that it was deadlocked nor deliberated for excessive amounts of time, the Allen instruction was premature and, thus, improper. Appellant further contends that the court compounded its initial error by issuing another Allen charge, using antiquated language that has been expressly prohibited by Maryland's appellate courts. The State, however, refutes appellant's claim of coercion and argues that any error or abuse of discretion committed by the trial court did not affect the jury's verdict.
The Court of Appeals in Kelly v. State, 270 Md. 139, 310 A.2d 538 (1973), examined the propriety of Allen-type instructions. Opining that the facts and circumstances may make a charge inadvisable or require that the trial court exercise great care in selecting the language of the instruction, the decision "as to whether to utilize an Allen-type charge, when to employ it, and what words should be selected are best left to the sound discretion of the trial judge." Id. at 143, 310 A.2d 538 (From the trial judge's "vantage point he has the opportunity to surmise which of the phrases in his instructions have been absorbed and which should be embellished or repeated.").
In an effort to be of assistance to trial courts, however, the Court suggested guidelines for employment of the charge. Briefly stated, the guidelines are:
1) that before the jury retires, the American Bar Association[[14]] approved charge is `always proper';

*722 2) that if the trial judge desires to `personalize' the charge given before the jury retires he has greater latitude in doing so then than [sic] later;
3) that after the jury retires the trial court `should closely adhere to the wording of the American Bar Association recommended instruction'; and that in the absence of such adherence a reviewing court will carefully scrutinize the language of the charge to determine whether the jury has been coerced or its province invaded.
Burnette, 280 Md. at 97, 371 A.2d 663.
A charge which departs from the recommended instruction will be closely scrutinized to insure that the charge conforms to the intent of the American Bar Association's developed standards. Id. at 97-98, 371 A.2d 663. The Court, therefore, does not require that the exact wording of the American Bar Association's approved instruction be the only instruction that a trial judge may employ. Kelly, 270 Md. at 142, 310 A.2d 538 ("We are not convinced of the need to imprison the trial judges of this State within the walls of foreordained verbiage."). Instead, the trial judge may "personalize" the charge, adopting minor deviations in language to adjust the charge to the circumstances encountered. Burnette, 280 Md. at 98, 371 A.2d 663. This personalization must be done cautiously and in the spirit of the American Bar Association's language. Deviations in substance will not be met with approval. Coercion of the jury for the purpose of breaking a deadlock will constitute reversible error. Id.
Turning to the facts, the jury, after deliberating for an hour and a half, sent a written question to the court asking, "What is assault in the first degree and what is assault in the second degree? Can you clarify?" The court subsequently summonsed the jury into the courtroom and re-instructed it regarding the definitions of first-degree and second-degree assault. Immediately thereafter, the court reminded the jury:
Your verdict must be unanimous. You must consult with one another and deliberate with a view in reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.
During deliberations do not hesitate to re-examine your own views. You should change your opinion if convinced *723 you are wrong, but do not surrender your honest belief as to the weight of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.[15]
Appellant argues that the court's sua sponte issuance of the abovementioned modified Allen charge was premature and, thus, akin to the reversible Allen-type instruction issued in Miller v. State, 10 Md. App. 157, 160, 268 A.2d 596 (1970) and Fletcher v. State, 8 Md.App. 153, 154-57, 258 A.2d 781 (1969).
In Fletcher v. State, supra, we reversed a defendant's conviction because the trial judge, after one hour and five minutes of jury deliberation and without having received any communication from the jury indicating that it was deadlocked, interrupted deliberations and issued an Allen charge. Id. at 158, 258 A.2d 781. Our principal concern was not with the language employed,[16] but with the coercive effect that the instruction may have had upon the jury in the circumstances and conditions under which it was given. With no communication of any kind, the judge, on his own initiative, decided to interrupt jury deliberations and give the Allen charge. The single fact that the jury had been deliberating for one hour and five minutes did not justify, in the absence of other compelling factors, the interruption of its deliberations, returning the jury to the courtroom and issuing the Allen charge. Id. at 158, 258 A.2d 781. Noting that the case involved three separate defendants in a joint trial, each represented by separate attorneys, we held that the use of the charge was premature and that, under the circumstances, we were unable to say that the instruction had no coercive or compelling influence upon the jury. Id.; see also Miller, 10 Md.App. at 160-61, 268 A.2d 596 (trial court's issuance of an Allen charge, sua sponte, after the jury had deliberated for one hour and twelve minutes and after the foreman expressly stated that there was a possibility of reaching a decision in the case constituted reversible error).
Conversely, in Stewart v. State, 4 Md. App. 565, 244 A.2d 452 (1968), we reviewed the propriety of the trial judge's propounding of an Allen charge and held that the judge did not abuse his discretion. In Stewart, the jury began its deliberations at 4:25 p.m. Id. at 570, 244 A.2d 452. At 6:32 p.m., the jury sent a note to the judge requesting to hear additional testimony. The request was denied. Later, at 7:00 p.m., the jury advised the court that it could not reach a verdict. Id. The jurors continued to deliberate until the court gave the Allen charge at 10:37 p.m. Similarly, in Plumley v. State, 4 Md.App. 671, 245 A.2d 111 (1968), we approved the use of the Allen charge where, after a four-day trial and jury deliberations lasting approximately seven hours, the court returned the jury to the courtroom and gave the Allen charge. Although the foreman informed the court that "[w]e can report progress," when considering the length of the trial and the length of time the jury had been *724 deliberating, the resort to the charge was not improper. Id. at 681-83, 245 A.2d 111.
Prior to the trial court's sua sponte issuance of the Allen-type instruction, in the case sub judice, the jury had deliberated for one hour and a half before returning to the courtroom to have its questions regarding the definition of first-degree and second-degree assault resolved. The jury neither indicated that it was deadlocked nor that it was having difficulty reaching an agreement. Charged with weighing three days of evidence to reach a verdict on seven different counts, the one and one half hours of deliberations cannot be considered excessive. See Fletcher, 8 Md. App. at 158, 258 A.2d 781 (opining that the case was "not entirely uncomplicated" and that the jury's deliberation of one hour was not unreasonable).
Although it would have been preferable for the trial judge to wait until the jury either directly or indirectly communicated that it was deadlocked, the Allen-type charge was undoubtedly non-coercive. After submitting its question regarding assault in the first and second degree, the jury was summoned into the courtroom by the trial judge. Appellant requested that the court re-instruct the jury on reasonable doubt. The trial court granted appellant's request and included instructions on the presumption of innocence and the jury's obligation to be impartial. Reiterating the pattern instruction on the duty to deliberate along with the other general instructions was not coercive. Furthermore, the record clearly reflects that the jury was not coerced, as it later announced that it was deadlocked on the count of attempted second-degree murder.
Without reaching an agreement that night, the jury was released for the evening. Less than thirty minutes into deliberations the next day, the jury communicated to the court, at 10:46 a.m., "We are definitely deadlocked on question two on the verdict sheet. Everything else is agreed upon." The court subsequently called the jury into the courtroom. When asked if "further discussion would be helpful," the forelady answered in the negative. Over appellant's objection, the court instructed the jury:
[Y]our verdict must be unanimous. Your [sic] further instructed that there are many  there may be cases in which absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror as a result of his or her own conviction and not a mere acquiescence in the conclusions of your fellow jurors.
Each of you should examine the questions submitted with candor and with a proper regard indifference [sic] to the opinions of your fellow jurors. It is your duty, ladies and gentlemen of the jury, to decide this case if you can conscientiously do so. You should listen with a disposition to be convinced to each other's arguments. If your views are contrary to those of the vast majority you should consider whether your views which make no impression on the minds of so many equally intelligent jurors are correct.
You're again reminded that your verdict must be the [sic] unanimous. You must consider the evidence and weigh the evidence in light of the discussions of your fellow jurors. Under the circumstances, madame forelady, in light of the fact that you've only been deliberating for an hour, this court is sending you back for further deliberations in this matter.
Even though the employment of the Allen charge appears justified given the jury's statement that it was deadlocked, for an Allen charge to be proper, "it must be couched in language and delivered in a *725 manner to avoid `savoring of undue pressure or coercion to reach a verdict.'" Miller, 10 Md.App. at 160, 268 A.2d 596 (citing 1 Branson's Instructions to Juries (3rd Ed. A. Reid 1960 Repl.) pp. 149-50). Pursuant to the guidelines set forth in Kelly, the trial court was required to closely adhere to the wording of the American Bar Association's recommended instruction.
Similar to the ABA instruction, the trial court's charge pays attention to the important principle that honest judgment, and not mere acquiescence, should be the basis of a juror's decision. The instruction places emphasis on the fact that questions are to be considered with "proper regard and deference to the opinion of others." Although a definition of the phrase "proper regard and deference" is not given, the jury is later told that, "[i]f your views are contrary to those of the vast majority you should consider whether your views, which make no impression on the minds of so many equally intelligent jurors, are correct." (Emphasis added). Consequently, the charge focuses on the minority, portraying it somehow as the cause of the deadlock.
The trial judge in Burnette issued an Allen-type charge using identical language. The Court of Appeals opined that "[i]t is difficult to imagine a minority juror who would not be placed in some discomfort on hearing this instruction. Criticism runs directly to him, and he might understandably conclude that proper `deference' to the opinions of the majority demands that he abandon his conscientious position." Id. at 100, 371 A.2d 663. On the other hand, the "equally intelligent" majority receives flattering attention and is subjected to no criticism. Id. "If anything, the instruction might tend to unduly strengthen the majority's convictions, perhaps making the majority less willing to seriously engage in further deliberations." Id.
While the trial court's instruction clearly deviated in substance from the ABA's recommended charge, it was not coercive. Prior to the trial court's issuance of a second Allen-type charge, the jury announced that it was hung on the count of attempted second-degree murder. Even after the instruction, the jury remained deadlocked on the count. Because it is unquestionable that the jury was not coerced into convicting appellant of the assault and handgun charges, the conviction may stand.

IV
Appellant complains that there was insufficient evidence to convict him of Count seven, unlawfully possessing a regulated firearm, to wit, an unknown caliber handgun. Specifically, appellant argues that the State failed to prove beyond a reasonable doubt that he possessed a regulated firearm with a barrel less than sixteen inches long. The State contends, however, that appellant did not raise the claim sub judice in support of his motion for judgment of acquittal and, thus, the issue is not preserved on appeal. Advancing its argument, the State asserts that, even if preserved, there was sufficient evidence to support appellant's conviction.
Appellate review of an insufficiency of evidence claim is available only for the reasons given by appellant in his motion for judgment of acquittal. Taylor v. State, 175 Md.App. 153, 160, 926 A.2d 805 (2007). During his motion, appellant argued that, because "[w]e have one handgun," only one of the handgun counts should go to the jury. Thus, appellant did not preserve this issue for appeal. Furthermore, we agree with the State's contention that, even if the issue was preserved, it would fail on the merits.
*726 The standard for appellate review of evidentiary sufficiency is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Suddith, 379 Md. 425, 429, 842 A.2d 716 (2004) (quoting State v. Smith, 374 Md. 527, 533-34, 823 A.2d 664 (2003)). The function of the jury as the fact finder is to weigh the credibility of witnesses and to resolve conflicts in testimony. Suddith, 379 Md. at 429, 842 A.2d 716 (quoting State v. Stanley, 351 Md. 733, 750, 720 A.2d 323 (1998)). Thus, we will give "due regard to the [fact finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." Suddith, 379 Md. at 430, 842 A.2d 716 (quoting Moye v. State, 369 Md. 2, 12, 796 A.2d 821 (2002)). Moreover, in assessing the sufficiency of evidence presented at trial, the limited question before us is not "whether the evidence should have or probably would have persuaded the majority of fact finders but only whether it possibly could have persuaded any rational fact finder." Jenkins v. State, 146 Md.App. 83, 137, 806 A.2d 682 (2002) (quoting Fraidin v. State, 85 Md. App. 231, 241, 583 A.2d 1065 (1991)) (emphasis in original).
Section 5-133(b)(1)[17] of the Public Safety Article of the Maryland Annotated Code prohibits a person from possessing a regulated firearm if the person has been convicted of a disqualifying crime. (Emphasis added). A regulated firearm includes a handgun. § 5-101(p)(1). A handgun is defined as a firearm with a barrel less than sixteen inches in length. § 5-101(n)(1).
Because the parties stipulated that appellant had been convicted of a disqualifying crime, the State was required to prove beyond a reasonable doubt that appellant possessed a firearm with a barrel less than sixteen inches in length. Brown v. State, 169 Md.App. 442, 463, 901 A.2d 846 (2006) (State must prove all the elements of a criminal offense beyond a reasonable doubt.).
There is no question that the gun at issue was concealed on appellant's person when appellant called Wright outside. Furthermore, Wright testified that, once outside, appellant "whipped out his gun" and shot him. Based on the circumstantial evidence, the jury could reasonably infer that the gun's barrel was less than sixteen inches long. See Black's Law Dictionary 243 (6th ed.1990) ("Circumstantial evidence" is defined as "Evidence of facts or circumstances from which the existence or nonexistence of fact in issue may be inferred. Inferences drawn from facts proved.").
The evidence was sufficient to support appellant's conviction of unlawfully possessing a regulated firearm.
JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.
COSTS TO BE PAID BY APPELLANT.
NOTES
[1] On June 2, 2006, the State entered a nolle prose qui as to the charge.
[2] Appellant's conviction for second-degree assault merged for the purposes of sentencing.
[3] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
[4] The parties stipulated that what was on the disc was transferred to a VHS tape for the purpose of showing the video in court. Appellant, therefore, takes issue with the original copy that was delivered to Detective Vila.
[5] The Court of Appeals opinion which reversed our decision will be referred to as Cole II and the opinion of this Court, Department of Public Safety and Correctional Services v. Cole, 103 Md.App. 126, 652 A.2d 1159 (1995), will be referred to as Cole I.
[6] A Regiscope camera simultaneously photographs a person cashing a check, the identification used by that person and the check itself, by means of a two-lens camera. Sisk, 236 Md. at 594, 204 A.2d 684.
[7] Regarding the purpose for introducing the videotape, while the record does not reveal whether the State had been informed that Wright would, in fact, identify appellant at trial, the purpose may not be determined from the sequence of the receipt of the evidence.
[8] Notably, the vagaries of courtroom identifications are not at issue in this case because it is undisputed that Wright had known appellant for three years prior to the shooting. The only issue presented is the credibility of his explanation as to why Wright did not identify appellant prior to trial.
[9] According to Jennings, Wright is known as "Juice" because he likes to drink and was "drunk" the night of the shooting. Wright testified, however, that he had only one drink of Bacardi Rum.
[10] Because we determined that the admission of the videotape and still photographs was harmless, we focus our discussion on whether Detective Vila's testimony regarding his observations of the videotape was proper.
[11] On each photograph was the date, June 23, 2005 and the military version of the time.
[12] Although appellant points to this ruling in support of his claim regarding "implicit" identification, appellant failed to object when the court ruled that the detective could refer "to the individual depicted" and did not request a curative instruction or additional action by the court.
[13] The term "Allen charge" is derived from Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In Allen, the Supreme Court approved the use of a jury instruction which specifically asked the jury to conciliate their differences and reach a verdict. In the years following the decision, the Allen instruction came under increasing criticism by state and federal courts on the grounds that the charge was coercive and intruded upon the function of the jury. See Huffman v. United States, 297 F.2d 754, 759 (5th Cir.1962) (Designed to achieve jury unanimity in deadlock situations, the instruction has been referred to as the "dynamite" or "nitroglycerin" charge.). Courts, in establishing parameters for an Allen instruction have employed different language to convey the spirit of the charge. For this reason, the Court of Appeals has referred to such an instruction or one merely reminding the jury of its responsibilities as an "Allen-type" charge. Kelly v. State, 270 Md. 139, 140 n. 1, 310 A.2d 538 (1973).
[14] The following is the ABA approved Allen-type instruction before the jury begins its deliberations:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges-judges of the facts. [Note: In 1980, the Court of Appeals in Stevenson v. State, 289 Md. 167, 423 A.2d 558 (1980), limited the jury's role from "judges of both the law and the facts" to judges of the facts.] (In criminal cases substitute the following: Since this is a criminal case, you are judges-judges of both the law and the facts.) Your sole interest is to ascertain the truth from the evidence in the case.
Kelly, 270 Md. at 143, 310 A.2d 538 (citing Instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97-98 (D.C.1961)) (citations omitted); see also Burnette v. State, 280 Md. 88, 96, 371 A.2d 663 (1977).
[15] The court also issued this exact instruction before the jury was excused to deliberate.
[16] With the exception of the court's statement, "We do not feel there is anything technical to be decided here. It's a question of arriving at a judgment," the language employed was identical to the language approved by the Court of Appeals. Id. at 157, 310 A.2d 538.

In the instant case, the trial judge's charge to the jury is the exact language of the Maryland Criminal Pattern Jury Instruction for the "Jury's Duty to Deliberate." In accordance with case law, the "Notes on Use" provide that the "instruction may be given before the jury deliberates and/or if the jury becomes deadlocked." MPJI-Cr 2:01 (2006).
[17] Unless otherwise indicated, the Court will refer to Maryland Code, Public Safety Article §§ 5-101 to End (2006).